IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ANTHONY D. STANTON #208310, )
 )
    Plaintiff, ) Case No. 3:16-cv-00841
 )
v. ) Judge Campbell
 )
SOUTH CENTRAL FACILITY, et al., )
 )
    Defendants. )

## MEMORANDUM

Plaintiff Anthony Stanton, a convicted state inmate, filed this *pro se* action under 42 U.S.C. § 1983 against a state prison in which he was previously housed and several of its staff and agents. The Complaint (ECF No. 1) is before the Court for an initial review pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(e)(2) and 1915A, and 42 U.S.C. § 1997e.

**I.    Standard of Review**

Under the PLRA, the Court must conduct an initial review of any civil complaint filed *in forma pauperis*, 28 U.S.C. § 1915(e)(2), or brought by a prisoner-plaintiff against government entities or officials, 28 U.S.C. § 1915A, or challenging the conditions of confinement, 42 U.S.C. § 1997e(c). Upon conducting this review, the Court must dismiss the complaint, or any portion thereof, that fails to state a claim upon which relief can be granted, is frivolous, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2) and 1915A; 42 U.S.C. § 1997e(c). The Sixth Circuit has confirmed that the dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), "governs dismissals for failure to state a claim under those statutes because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). Thus, to survive scrutiny on initial review, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In reviewing the complaint to determine whether it states a plausible claim, "a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). A *pro se* pleading must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). *Pro se* status, however, does not exempt a plaintiff from compliance with relevant rules of procedural and substantive law. *See Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) ("Neither [the Supreme] Court nor other courts . . . have been willing to abrogate basic pleading essentials in pro se suits."); *see also Brown v. Matauszak*, 415 F. App'x 608, at *5 (6th Cir. Jan. 31, 2011) (affirming dismissal of pro se complaint for failure to comply with "unique pleading requirements" and stating, "a court cannot create a claim which [a plaintiff] has not spelled out in his pleading") (citation and internal quotation marks omitted; alteration in original).

**II.     Factual Allegations**

Plaintiff alleges that, as a diabetic, he has a medical need to be housed on a bottom bunk and that he has a medical bottom bunk restriction in his institutional file. (ECF No. 1, at 11.) On April 10, 2015, upon Plaintiff's return to the prison from a court date, the count room assigned him to a bottom bunk that another inmate was already occupying. Plaintiff alleges that he discussed his assignment and his restrictions with "multiple officers," but ultimately "reluctantly climbed into the top bunk, due to the alternative of segregation for refusal of a direct order and/or Refusal of Cell Assignment and in lieu of my restrictions." (Id.) Plaintiff alleges that two weeks later, on the morning of April 25, 2015, he fell out of the top bunk and hurt himself.

After his fall, Plaintiff borrowed some crutches from a fellow inmate and was taken to the prison medical center, where he was seen by two nurses within one to one and a half hours of his fall. (ECF No. 1, at 11.) One of the nurses prescribed 200 mg. of ibuprofen for his injury. Plaintiff returned to his housing unit and discussed his fall and his inability to climb into a top bunk with staff, and a sergeant approved his move to a bottom bunk in an orientation cell. (ECF No. 1, at 12.)

On April 27, 2015, Plaintiff was taken back to the prison medical center for a follow-up on his injury, but the nurse practitioner was too busy to see him. Another nurse issued Plaintiff a pair of crutches and gave him a copy of his health form with the bottom bunk requirement highlighted. (ECF No. 1, at 12.) Plaintiff alleges that when he returned to the housing unit from the medical center on April 29, 2015, some unidentified count room officer(s) had instructed the officer on duty that Plaintiff was to return to his previous cell and was assigned to the top bunk. (ECF No. 1, at 12.) Plaintiff again raised his need for a bottom bunk and offered to move to another housing unit in order to be assigned a bottom bunk. (Id.) However, when case manager Sweat let Plaintiff know that his move to another unit would entail his losing his job as a rockman, Plaintiff felt he was in a "'no win' position" and "reluctantly" returned to the cell in which he was assigned to a top bunk. (ECF No. 1, at 12-13.) Plaintiff slept on his mattress on the floor for "a few nights," until he was ordered to stop sleeping on the floor and returned to the top bunk. (ECF No. 1, at 13.)

Plaintiff alleges that he fell again on May 1, 2015, while trying to climb down from the top bunk, and was given permission to return his mattress to the floor. (ECF No. 1, at 13.) The next day, however, Plaintiff "was again directed to return to the top bunk and did so due to fear of disciplinary and loss of [his] current rockman position." (Id.)

Sometime between April 25 and May 4, 2015, Plaintiff filed a grievance about his need for a bottom bunk. (ECF No. 1, at 13.) On May 4, 2015, Plaintiff was placed in segregation for refusing to move to a different housing unit, where he would have had a bottom bunk but would have lost his prison rockman job. (ECF No. 1, at 13-14.) Plaintiff alleges that throughout this time, there was

a bottom bunk available in one of the orientation cells.

On May 5, 2015, Plaintiff was moved out of segregation and into a new housing unit with a bottom bunk assignment. (ECF No. 1, at 14.) Once again, however, Plaintiff alleges that another inmate was already using the bottom bunk to which he was assigned. Plaintiff discussed his concerns about the assignment with a correctional sergeant, who sought and received authorization for Plaintiff to trade assignments with an inmate in the next cell for a bottom bunk. The unit manager has questioned the arrangement, but Plaintiff has nevertheless remained in his bottom bunk since that time. (ECF No. 1, at 14-15.)

On May 7, 2015, the prison contract physician, Dr. Coble, examined Plaintiff for any injury from his fall(s). (ECF No. 1, at 15.) Dr. Coble ordered an x-ray of Plaintiff's right leg, which was performed on May 15, 2015. After filling out multiple sick call requests and asking staff about a follow-up appointment, Plaintiff saw Dr. Coble again on June 4, 2015. Dr. Coble informed Plaintiff that the x-ray revealed that a pin in Plaintiff's right ankle from a previous surgery was broken, and referred him to a bone specialist outside the prison. (ECF No. 1, at 15.) Dr. Coble also ordered Plaintiff to continue his regimen of 600 mg. of ibuprofen three times a day, but apparently did not prescribe the nortriptyline that Plaintiff requested for restless sleep.

On June 29, 2015, Plaintiff was transported to the Hardin County Medical Center to see the bone specialist and have additional x-rays of his right ankle. (ECF No. 1, at 16.) The specialist informed Plaintiff that his bone did not break during his fall and that he "should be alright without surgery." The specialist stated that although most doctors would want to remove a broken pin, "there is no need for hurry at this time." The specialist ordered crutches for an additional two weeks, with gradual increase in weight-bearing on his injured ankle. In response to Plaintiff's complaints about discomfort and restless sleep, the specialist noted that Plaintiff has arthritis, for which he could receive any necessary treatment at the prison. Plaintiff does not allege that the specialist prescribed nortriptyline, but states that "I am currently awaiting the start of the ordered

Nortripline [sic] and continue my six hundred (600 mg) Ibuprofren [sic] three times a day." (ECF No. 1, at 16.)

Finally, Plaintiff alleges that he has experienced vision problems since 2014 due to cataracts. (ECF No. 1, at 17.) He says that he saw a doctor in 2014 who told him that he would be scheduled for cataract surgery, which could only be performed one eye at a time. After months of further deterioration of his vision, and several inquiries to the prison nursing staff who informed him that it was not up to them to schedule surgery, Plaintiff submitted sick call requests and saw the doctor again. The doctor told Plaintiff that he was scheduled for surgery on his right eye on December 4, 2014, and personally faxed the outside clinic to make the appointment. (Id.) But Plaintiff was not transported to the clinic in December. He saw the prison doctor again on May 15, 2015, and asked why he had not received surgery. The doctor responded that he had done all he knew to do and that "the reason for the negligence, may be due to my sentence expiration date is nearing an end." (ECF No. 1, at 18.) Plaintiff filed a prison grievance about his cataract surgery, and finally underwent surgery on his right eye on June 11, 2015. Plaintiff was returned to the clinic for a post-operative check the next day, when he learned that was supposed to be using eye drops, but there was a delay of several days before he received the drops at the prison. (ECF No. 1, at 18-19.)

## III. Discussion

Plaintiff brings suit under 42 U.S.C. § 1983 to vindicate alleged violations of his federal constitutional rights. Section 1983 confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that "the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor*, 316 F. 3d 584, 590 (6th Cir. 2003)

(citations omitted); 42 U.S.C. § 1983.

Plaintiff fails to state a claim for violation of his rights under the Eighth Amendment. Deliberate indifference to a prisoner's serious medical needs "constitutes the unnecessary and wanton infliction of pain" and violates the Eighth Amendment. *Ruiz v. Martin*, 72 F. App'x 271, 275 (6th Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 570 (6th Cir. 2013).

But mere claims of negligent treatment or medical malpractice do not amount to deliberate indifference. *Estelle*, 429 U.S. at 106. The subjective component of a deliberate indifference claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To establish the subjective component of this alleged violation, a prisoner must plead facts showing that "prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). A defendant's state of mind is sufficiently culpable to satisfy the subjective component of an Eighth Amendment claim when it amounts to a reckless disregard of a substantial risk of serious harm; behavior that is merely negligent will not suffice. *Farmer*, 511 U.S. at 835-36. Consequently, allegations of medical malpractice or negligent diagnosis and treatment do not state an Eighth Amendment claim for cruel and unusual punishment. *See Estelle*, 429 U.S. at 106

("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). To prevail under those circumstances, an inmate must establish that the treatment he received was "so woefully inadequate as to amount to no treatment at all." *Ruiz*, 72 F. App'x at 276 (quoting *Westlake*, 537 F.2d at 860 n.5).

Plaintiff's own complaint demonstrates that the jail has provided frequent medical care for his ailments, and that medical staff have made efforts to diagnose his conditions and to alleviate his symptoms that cannot be characterized as "woefully inadequate." He was provided with pain medication for his ankle injury, which a specialist concluded did not require additional treatment. He attributes some restless sleep to pain from his injury and complains about not being provided with nortriptyline to help him sleep, but he was provided with ibuprofen for the pain, and he does not allege that his condition was serious enough to cause him to experience prolonged sleep deprivation or any other actual injury. After a six-month delay, he received cataract surgery and follow-up treatment on his right eye. The simple fact that he has experienced delays in the course of his treatments and is still waiting for cataract surgery on one eye is not sufficient to establish the unnecessary and wanton infliction of pain required to offend the Constitution, particularly where he has not alleged that any complications or additional injuries have been caused by the delays. The prison's medical staff may not have been completely effective in remedying Plaintiff's physical complaints, but they do not appear to have been deliberately indifferent to them.

Plaintiff acknowledges that he has been in a bottom bunk since May 2015. The alleged facts indicate that the limited time he spent in an upper bunk before that date is attributable to either negligence on the part of prison staff for assigning him to an occupied bottom bunk or his decision not to dispute another inmate's use of his assigned bunk, as well as Plaintiff's own choice to stay

in a top bunk rather than lose his inmate job by moving to another unit where he could have a bottom bunk. The fact that prison staff ultimately punished Plaintiff with segregation in order to force him to comply with the move suggests that they were not indifferent to his need for a bottom bunk.

**IV.    CONCLUSION**

For the reasons set forth herein, this action will be DISMISSED for failure to state a claim upon which relief can be granted. An appropriate Order is filed herewith.

_____
TODD CAMPBELL
United States District Judge